764 P.2d 119

**STATE of Idaho, Plaintiff–Respondent,**

**v.**

**Timothy Vernon ALGER, Defendant–Appellant.**

**No. 16653.**

Court of Appeals of Idaho.

Nov. 2, 1988.

Petition for Review Denied Jan. 10, 1989.

Amil N. Myshin, Boise, for defendant-appellant.

Jim Jones, Atty. Gen. by Michael A. Henderson, Deputy Atty. Gen., Boise, for plaintiff-respondent.

BURNETT, Judge.

On a wintry evening in 1984, an Albertson's supermarket in Boise was robbed at gunpoint. Law enforcement officers throughout Idaho began searching for two suspects, Timothy Alger and an alleged accomplice. Several days later, Alger and his partner were spotted in Twin Falls. After a lengthy pursuit and intense manhunt, both individuals were apprehended. A jury eventually found Alger guilty of armed robbery. The judge imposed a ten-year indeterminate sentence for the robbery and a fifteen-year indeterminate enhancement for use of a firearm during commission of the crime. On appeal, Alger has presented a potpourri of issues falling into three general categories: (1) pretrial suppression of evidence, (2) admission and sufficiency of evidence at trial, and (3) propriety of the sentence imposed. For reasons explained below, we affirm the district court's judgment.

I

Before trial, Alger moved to suppress evidence obtained by police investigators from several different sources: eyewitness identifications, statements made by Alger to the police following his arrest, and items seized during the search of a motor home rented by Alger. The motion was denied. We will discuss each point in turn.

A

■ Alger first contends that the trial court should have suppressed a "tainted eyewitness identification." This contention appears to be directed primarily at the alleged unreliability of an identification made by one of the eyewitnesses. The issue is loosely styled as a due process claim because Alger argues that the eyewitness's subsequent in-court identification of him was corrupted by unduly suggestive pretrial identification procedures. Where, as here, the issue is whether a constitutional violation appears from a set of facts, we exercise free review. *Standards of Appellate Review in State and Federal Courts*, IDAHO APPELLATE HANDBOOK § 3–3 (Idaho Law Foundation, Inc. 1985).

■ Generally speaking, due process requires the suppression of an eyewitness identification obtained as a result of confrontations "so unnecessarily suggestive" that they are "conducive to irreparable mistaken identification." *Neil v. Biggers*, 409 U.S. 188, 196, 93 S.Ct. 375, 380, 34 L.Ed.2d 401 (1972) (quoting *Stovall v. Denno*, 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967)). Suggestiveness, in turn, is determined according to the totality of the circumstances. *Id.* See also *State v. Hoisington*, 104 Idaho 153, 657 P.2d 17 (1983). Although this test has been employed in determining whether an in-court identification has been unduly tainted by a suggestive out-of-court identification, it also may be used—with deletion of the word "irreparable"—as a standard for the admissibility of testimony concerning the out-of-court identification itself. *Neil v. Biggers, supra.*

■ In this case, four Albertson's employees were present at the time of the robbery. Alger's primary challenge concerns the identification by one of these four. Of the other three, one testified that he could not identify Alger because he was not close enough to the front of the store

to get a proper view. The other two employees positively identified. Alger in pretrial physical lineups and photo lineups. They reiterated the identifications at trial. Alger makes no claim that these identifications were constitutionally infirm. Instead, he focuses his attack upon an identification by the fourth employee, a night manager, who had the longest opportunity to study the robber. He was the person who handed over money from a cash register and from the store safe.

Before the preliminary hearing, but some twenty-one months after the robbery, the night manager was shown an eight-person photo lineup. He positively identified Alger as the man who had pointed a revolver at him and demanded money. The same employee then was subpoenaed to testify at the preliminary hearing. When he arrived in court, he noticed the back of the head of the accused, who was seated in the front of the courtroom. For reasons not germane to our discussion, the hearing was continued before the employee could testify. In the interim, the employee was taken to a live lineup where he was unable to identify anyone positively. However, at the resumed preliminary hearing and at the trial, he positively re-identified Alger as the man who had robbed the store. Defense counsel was allowed to challenge this identification by eliciting on cross-examination all the circumstances surrounding the pretrial identification proceedings.

We fail to see how the pretrial confrontations in this case were unduly suggestive. Although a significant period of time elapsed between the robbery and the first photo lineup, the identification—selected from an eight-picture lineup—was unequivocal. Other than the lapse of time, no claim is made that this confrontation somehow was improper. Furthermore, prior to this lineup the witness had made no con-

trary identifications tending to undercut his reliability. Neither was he subjected to any inherently suspect confrontations that might have impaired his ability to identify Alger based upon his memory of the robbery itself.[1] Finally, the unexpected courtroom "confrontation" at the original preliminary hearing was not face-to-face, and it does not appear to have focused the witness's attention upon Alger. Indeed, at the physical lineup held after the preliminary hearing was continued, the witness was unable to make a positive identification.

In sum, although this particular eyewitness's identification of Alger at trial may have harbored some uncertainty, it was not contaminated by any unduly suggestive confrontation.[2] The identification was properly presented to the jury along with the background facts. The jurors were entitled to accord the evidence whatever weight they deemed appropriate.

### B

Alger next asserts that statements made by him to a police officer while he was hospitalized were involuntary and, therefore, were admitted at trial in violation of his Fifth Amendment privilege against self-incrimination. Alger received *Miranda* warnings and agreed to speak with the police at the beginning of the interrogation. However, he contends that the waiver of his Fifth Amendment right was tainted by the influence of pain medication. With this contention the district court did not agree.

Any waiver of *Miranda* rights or of the underlying constitutional privilege against self-incrimination must be made voluntarily, knowingly and intelligently. *State v. Hall*, 111 Idaho 827, 727 P.2d 1255 (Ct.App.1986). The issue in this case is

1. Examples of suspect confrontations include single-person showups or repeated lineups in which one person continually reappears. *See, e.g., Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (single subject showup is inherently suspect); *Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969) (recurring presence of same individual in successive lineups is unduly suggestive).

2. Accordingly, we need not reach the second stage of a due process inquiry—whether, under the totality of circumstances, an identification was reliable even though the identification procedure was suggestive. *State v. Hoisington, supra*, 104 Idaho at 162, 657 P.2d at 26.

whether Alger possessed the capacity to make voluntary, knowing and intelligent decisions despite the influence of medication. On appeal, we conduct an independent examination of the record to determine whether, under the totality of the circumstances, the waiver was valid. *E.g.*, *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976). Intoxication, or the influence of narcotics, is one such circumstance; but it alone does not automatically signify that a waiver is invalid. *State v. Mitchell*, 104 Idaho 493, 660 P.2d 1336 *cert. denied*, 461 U.S. 934, 103 S.Ct. 2101, 77 L.Ed.2d 308 (1983) (discussing effect of intoxication).

■ Here, the record contains no specific reference to the amounts or types of medication ingested by Alger at or near the time of the questioning. However, the record does contain evidence that Alger was able to make a valid waiver. The conversation with the investigating officer was recorded. A transcript of the conversation indicates that Alger was coherent. After an officer read his rights, Alger stated that he fully understood them. He signed a written waiver form. He gave detailed and lengthy responses to questions posed by the officer. There is no indication that he was confused or mentally incapacitated. Based on our independent review of the record, we agree with the district court that Alger voluntarily waived his privilege against self-incrimination. The trial judge did not err in admitting the statements made in the hospital.

### C

■ Alger also challenges, albeit rather perfunctorily, the search of a motor home used by him and his accomplice. His brief declares, without any ensuing discussion or argument, that the search was without probable cause. We disagree.

The motor home search was conducted pursuant to a warrant issued by a Twin Falls magistrate. When a search has been made pursuant to a warrant, the burden is on the defendant to demonstrate that the search was invalid. *State v. Kelly*, 106 Idaho 268, 678 P.2d 60 (Ct.App.), *cert. de-*

*nied*, 469 U.S. 918, 105 S.Ct. 296, 83 L.Ed.2d 231 (1984). Here, other than a naked allegation, Alger has offered us no basis to find that the warrant was issued upon less than probable cause. The record strongly suggests otherwise. We conclude that the trial court did not err in admitting the fruits of the motor home search into evidence.

### II

Alger next raises three evidentiary issues. Two of these issues concern decisions by the judge to admit evidence during the trial. The third issue is the sufficiency of all the evidence to support the jury's verdict.

### A

Alger first contends that the trial court erred by admitting evidence of events that occurred subsequent to the Boise robbery. Specifically, he objects to the admission of testimony concerning Alger's capture near Twin Falls and a subsequent escape from the Jerome County jail. Alger contends that this evidence was both irrelevant and unduly prejudicial. We first discuss the escape.

### 1

■ So far as we can discern, the sole reference in the record to the escape is a fleeting mention of that fact by a police officer while being cross-examined by defense counsel. Counsel made no objection or motion to strike the testimony at that time. The only objection to testimony about events following the robbery was contained in a motion *in limine*, made at the outset of the trial, in which counsel sought to exclude "any evidence brought in concerning the Twin Falls incident as being irrelevant to the incident that allegedly occurred in Boise." It is clear that this motion referred to the pursuit and apprehension of the two suspects near Twin Falls. We cannot construe it also to cover the escape from the Jerome County jail, which took place more than a week later.

Generally, an appellate court will not consider a claim of error in the admission of evidence unless there was a timely objection at trial. *State v. Carlson,* 108 Idaho 859, 702 P.2d 897 (Ct.App.1985). Our review of the record convinces us that this issue has not been preserved on appeal. Neither do we consider the error, if any, to be "fundamental." *See State v. Haggard,* 94 Idaho 249, 251, 486 P.2d 260, 262 (1971). We need not discuss the issue further.

2

The next issue, concerning evidence of the "Twin Falls incident," is properly before this Court. Although defense counsel's objection was broad, we deem it sufficient to preserve the question for review on appeal. The testimony of which Alger now complains was given by several Twin Falls and Jerome County law enforcement officers. The testimony related a series of events, beginning with the spotting of the suspects in Twin Falls and culminating in their arrests. The witnesses described the spotting of the suspects in a car known to have been used while fleeing from the scene of the Boise robbery. They also described a subsequent high-speed chase from Twin Falls into the countryside. During that chase, shots were fired from the car and one police officer was wounded. Officers further testified about the capture of Alger nearly two days later near the rim of the Snake River Canyon. In addition, testimony was introduced concerning items seized from the motor home and from the car used by the suspects. Many of the items seized were identified as having been used in the Boise robbery or as having been stolen during the robbery. They included weapons used in the hold-up and clothing worn by the perpetrators. Finally, one of the officers identified Alger as the man he had seen enter the motor home just prior to the capture. The state has contended on appeal, as did the prosecutor at trial, that all this evidence was relevant for two purposes: consciousness of guilt and identity.[3] We will focus our discussion on identity.

Rule 404(b) of the Idaho Rules of Evidence allows admission of evidence of other crimes, wrongs or acts for the purpose of proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Here, the central issue at trial was the identity of persons who robbed the Albertson's store. Testimony regarding the "Twin Falls incident" was highly probative of Alger's identity as one of those persons. The evidence tied Alger and his accomplice to the vehicle and weapons used in the robbery, to the clothes and disguises worn by the robbers, and to some of the "loot" stolen. We hold that this evidence was relevant. *See* I.R.E. 401.

We qualify our holding in one respect. We believe the evidence of flight from the police was not relevant to prove identity. Although the chase tied Alger to the vehicle and to the items seized from the car, it did not produce an on-site identification because Alger was not apprehended at the conclusion of the chase. Rather, he escaped on foot. It was the subsequent search and surveillance of the motor home which led to his identification and capture. Accordingly, we conclude that although the items seized from the car were admissible, testimony concerning the chase itself had little connection with the issue of Alger's identity. The trial judge erred in admitting that portion of the testimony.

However, this does not end our inquiry. We must determine whether the error mandates reversal. Rule 52, I.C.R., provides that "any error ... which does not affect substantial rights shall be disregarded." In determining whether an error has affected substantial rights or is harmless, the inquiry is "whether it appears from the record that the ... [error] contributed to the verdict, leaving the appellate court with

---

**3.** It has been held that evidence of flight may be introduced to demonstrate consciousness of guilt. *See, e.g., United States v. Harris,* 792 F.2d 866 (9th Cir.1986). However, we note that our Supreme Court has criticized the use of jury instructions which inform the jury that an inference of guilt may be drawn from evidence of flight from police officers. *See State v. Wrenn,* 99 Idaho 506, 584 P.2d 1231 (1978). Here, the jury was not so instructed.

a reasonable doubt that the jury would have reached the same result had the [error] not occurred." *State v. Palin*, 106 Idaho 70, 75, 675 P.2d 49, 54 (Ct.App.1983).

Here, we believe that the error was harmless. To be sure, there was a chance that the jury might infer from the chase and shootout that Alger was an outlaw and therefore predisposed to commit a robbery. However, this risk was vastly outweighed by other compelling evidence establishing Alger's involvement in the robbery. The state presented overwhelming testimonial and physical evidence explicitly tying Alger to the crime. Accordingly, we are convinced beyond a reasonable doubt that testimony regarding the chase did not contribute to the verdict. Its admission was harmless error.

B

Alger's second evidentiary issue focuses upon the trial judge's refusal to admit an article entitled "Eyewitness Testimony," which had appeared in the December, 1974, issue of *Scientific American* magazine. The article discussed social science research disclosing problems of reliability in eyewitness identification testimony. The trial judge ruled that the article was inadmissible hearsay.

Alger argues that the article should have been admitted, despite a lack of live testimony by the author, because an article culled from a well-known periodical is a self-authenticating document. *See* I.R.E. 902(6). We think this argument misses the point. The issue is not whether the document was authentic; it is whether the document contained hearsay and, if so, whether any exception to the hearsay rule was applicable. Underlying this issue is a broader question of policy: whether juries should be allowed to consider as "facts" the data and conclusions generated by social science research.

We first discuss the hearsay question. Although a research article may be hear-

say, it is admissible at trial if it is introduced in compliance with the "learned treatise" exception to the hearsay rule. *See* I.R.E. 803(18). The state has argued that this exception is available only when an expert witness relies upon the treatise or when the treatise is used by counsel to cross-examine the expert. Indeed, the literal language of the rule may invite such an interpretation. The rule provides that learned treatises are admissible

[t]o the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or arts, established as a reliable authority by testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits, *except upon motion and order for good cause shown.* [Emphasis added.]

Moreover, the federal counterpart to Rule 803(18), which is identical except for the language emphasized above, has been interpreted restrictively. *See* Advisory Committee Note to F.R.E. 803(18).

However, in its appended comments to I.R.E. 803, the Idaho State Bar Evidence Committee has indicated that the ambit of the Idaho learned treatise exception is broader than its federal counterpart. Relying on earlier Idaho case law, the Committee suggested that Rule 803(18) should be considered in conjunction with the "catchall" exception to the hearsay rule set forth in I.R.E. 803(24). The Committee observed that the application of Rule 803(18) could be extended to situations in which a learned treatise was sought to be introduced into evidence, but no expert witness was called to testify concerning the same issues discussed in the treatise. *See Report of the Idaho State Bar Evidence Committee* C 803 p. 40 (1985).[4]

---

4. As the Committee stated:

The catch-all exception is simply a logical extension of the other hearsay exceptions. Each of the "recognized" exceptions is based on two main factors: *necessity* and *trustworthiness.*

Idaho law has recognized these factors as the foundation to its hearsay exceptions. *See*

The Committee also referred to cases decided under I.C. § 9–402, a statute codifying the former learned treatise exception. The statute provided broadly that "[h]istorical works, books of science or art and published maps or charts, when made by persons indifferent between the parties, are prima facie evidence of facts of general notoriety and interest." Thus, in *Tucker v. Union Oil of California*, 100 Idaho 590, 603 P.2d 156 (1979), *overruled on other grounds, Runcorn v. Shearer Lumber Products, Inc.*, 107 Idaho 389, 690 P.2d 324 (1984), our Supreme Court held that it was proper for a trial court to admit an article from a scientific journal even though no expert was called to testify concerning the matters contained in the article. The Court concluded simply that "[a]lthough hearsay, [the article] would be admissible under the hearsay exception, I.C. § 9–402, as a 'book of science' written by a person indifferent as between the parties." *Id.* 100 Idaho at 595, 603 P.2d at 161. And, in an earlier decision, the Supreme Court decided that it could take judicial notice of a geology treatise discussed in the appellants' brief. *Application of Boyer*, 73 Idaho 152, 248 P.2d 540 (1952).

■ Moreover, we believe that a broad interpretation of the learned treatise exception is consonant with the general policy underlying the Idaho Rules of Evidence. Rather than encouraging rigid formalism, the rules seek to promote justice through a flexible approach to truth-seeking. Where, as a matter of economic or practical necessity, a party seeks to introduce evidence in the form of a learned treatise, we discern no principled reason for precluding its admission merely because the treatise is unaccompanied by an in court witness. Ac-

cordingly, we conclude in this case that admission of the *Scientific American* article was not barred by Idaho's version of the hearsay rule.

Of course, this conclusion does not end our discussion. The learned treatise exception does not mandate admission of all published works. We still must determine, as a matter of policy, whether scientific research material on eyewitness identification should be allowed in court where identity is an issue at trial. As noted above, this type of evidence normally is presented in conjunction with the testimony of an expert who takes the witness stand. However, the policy issue does not turn on the method of presentation. The real question is whether research data and conclusions are appropriate aids for the triers of fact in evaluating eyewitness testimony.

In *State v. Hoisington*, 104 Idaho 153, 657 P.2d 17 (1983), a majority of our Supreme Court offered an answer to this question. Citing cases from other jurisdictions, the Court upheld a trial judge's exclusion of psychiatric testimony about the trustworthiness of eyewitness observations. The majority declared that the subject did not require elucidation by an expert because it was not "beyond the ken" of ordinary jurors. *Id.* at 165, 657 P.2d 29. Implicit in the Court's holding was an assumption that use of experts in this manner would invade the fact-finding function of the jury. *See, e.g., United States v. Brown*, 540 F.2d 1048 (10th Cir.1976), *cert. denied*, 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 549 (1977), cited in the majority opinion.

Faced with this same issue today, we think that our Supreme Court would follow

---

*McKay Constr. Co. v. Ada County Bd. of Comm'rs*, 96 Idaho 881, 538 P.2d 1185 (1975); *Washington County v. First National Bank*, 35 Idaho 438, 206 P. 1054 (1922); G. Bell, *Handbook of Evidence for the Idaho Lawyer*, 131 (2d ed. 1972). The catch-all exception merely applies these criteria without attempting to restrain them in an overly burdensome formula. Arguably, by so doing it promotes "the interests of justice" because, if the purpose of justice is to ascertain the truth, this rule simply provides a flexible structure to reach this end. [Emphasis original.]

In the *McKay* case cited by the Committee, our Supreme Court noted that the then-existing learned treatise exception had been given broad interpretation in Idaho. The Court explained that where the two major justifications for enlarging an exception to the hearsay rule—necessity and reliability—are shown to exist, the exception may be extended to embrace hearsay evidence not covered by the exception's literal terms.

a different approach. *Hoisington* was decided prior to adoption of the Idaho Rules of Evidence. These rules have expanded significantly the permissible scope of expert testimony. I.R.E. 702 broadly allows an expert witness to testify "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue...." Rule 704 further provides that otherwise admissible opinion testimony "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." The wide reach of the rules governing expert testimony is derived from a fundamental policy favoring admissibility of all relevant evidence. *See* I.R.E. 401.

■ The current rules substantially undercut the justifications listed by the *Hoisington* court for precluding expert testimony on eyewitness identification. General research data pertaining to this topic is relevant under the rules. Where a scientist's research casts doubt upon the ability of eyewitnesses to perceive accurately—or to memorize and recall fully—certain observed events, such research clearly has a "tendency to make the existence of any fact of consequence to the determination of the action [i.e. the reliability of the eyewitness identification in the instant case] more probable *or less probable* than it would be without the evidence." I.R.E. 401 (emphasis added). Moreover, any concern for invasion of the jury's fact-finding mission is obviated by Rule 704, which permits experts to render opinions on ultimate issues. Accordingly, we conclude that expert testimony concerning eyewitness identification is admissible under appropriate circumstances. *See* I.R.E. 403.

Our conclusion is consistent with recent decisions of other state courts that have considered this question. In *State v. Chapple*, 660 P.2d 1208 (Ariz.1983) (en banc), the Arizona Supreme Court held that even if jurors of ordinary education need no expert testimony to enlighten them on the dangers inherent in eyewitness identification, expert testimony on the issue nonetheless would be admissible to support a defense of misidentification. The Court reasoned that the concepts developed through the expert's research would be of substantial assistance to the jury. This trend is reflected by decisions of other courts mandating the use of jury instructions warning the jury of the dangers inherent in eyewitness identification. *See, e.g., State v. Warren*, 230 Kan. 385, 635 P.2d 1236 (1981); *Commonwealth v. Bowden*, 379 Mass. 472, 399 N.E.2d 482 (1980); *State v. Long*, 721 P.2d 483 (Utah 1986); *State v. Payne*, 167 W.Va. 252, 280 S.E.2d 72 (1981).

We recognize that the eyewitness identification issue illustrates a fundamental question regarding the use of social science research by the courts. The question is one of intense interest to legal scholars. Authors of the most highly developed thesis on the subject have identified three roles that such research can play in court. *See* Walker and Monahan, *Social Frameworks: A New Use of Social Science in Law*, 73 U.VA.L.REV. 559 (1987). At one end of the spectrum are data obtained specifically to aid in the determination of facts at issue in a single case. These case-specific or "adjudicative" facts usually answer the questions of who did what, where, when, how, why, and with what motive or intent. At the other end of the spectrum are data germane to determinations of law and policy. These have been termed "legislative" facts. Such types of research data traditionally have been admissible as substantive evidence. *See* I.R.E. 201.

In the middle of the spectrum is an emerging new category of data—findings of researchers which provide insight into the likelihood that certain events or behavior will occur under given conditions. This category includes research on eyewitness perception and recollection. Walker and Monahan describe this third category as a "social framework," and they define it as "the use of general conclusions from social science research in determining factual issues in a specific case." *Id.* at 570. Walker and Monahan note that social frameworks often are presented through the oral testimony of an expert witness. However, they argue that because social framework research provides a general guide for eval-

uating evidence, the research is more akin to law than to fact. Accordingly, they propose that the research be offered directly to the trial judge, who will evaluate it and, upon finding it to be apparently reliable and likely to assist the jury, will convey it to the jurors by special instruction.[5] *Id.* at 560. In this manner, Walker and Monahan assert, the level of social science research used by courts will be refined in much the same way that legal precedent evolves through continuous application.

The *Walker and Monahan* procedural scheme may not be universally accepted, and we do not mandate it in today's decision. But we agree with the authors' underlying thesis: "A novel role for empirical research is emerging—a use of general research conclusions to set a background context for deciding crucial factual issues at trial." *Id.* at 598. The courts should not categorically bar this new contribution of social science to the law. Rather, each introduction of a social framework—such as eyewitness observation research—should be evaluated carefully on its own empirical and legal merits. This evaluation requires trial judges to exercise a sound and informed discretion.

■■■ In the present case, the trial judge did not undertake such an exercise of discretion. He perceived the issue narrowly as whether the *Scientific American* article was excludible as hearsay. He held that it was. In doing so he erred, as we have explained. The question, then, is whether this error warrants reversal or—like the evidence of the police chase near Twin Falls—is harmless under I.C.R. 52. We conclude that it is.

As we have detailed above, there was abundant evidence, in addition to eyewitness testimony, implicating Alger in the

robbery. Alger was explicitly linked to the clothing and weapons used in the crime. His own statements were incriminating. Furthermore, the accomplice, having been convicted himself, stated that Alger participated in the robbery. Finally, there has been no showing of any unusually significant nexus between the eyewitness identifications in this case and the general problems identified in the *Scientific American* article. Thus, even if the article had been admitted, we remain convinced beyond a reasonable doubt that the verdict would have been the same.

### C

■■■ Alger's final evidentiary argument is that the jury's verdict was unsupported by the evidence. Appellate review of the sufficiency of the evidence is limited in scope. A judgment of conviction, entered upon a jury verdict, will not be set aside where there is substantial evidence upon which rational triers of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979). "[W]e are precluded from substituting our judgment for that of the jury as to the credibility of witnesses, the weight of the testimony, and the reasonable inferences to be drawn from the evidence." *State v. Campbell*, 104 Idaho 705, 718–19, 662 P.2d 1149, 1162–63 (Ct.App.1983). Furthermore, we view the evidence in the light most favorable to the respondent. *State v. Fenley*, 103 Idaho 199, 646 P.2d 441 (Ct.App.1982).

Throughout this opinion we have summarized the state's evidence. It is unnecessary to do so again. Suffice it to say that we find the evidence more than adequate to satisfy our standard of appellate review.

---

5. As Walker and Monahan state:
   If the evaluating judge finds both that the research supports the introduction of a social framework and that no policy issues—for example, the prohibition against some forms of character evidence—bar a framework's application, then the final procedural implication of the social authority view is clear: the results of the court's evaluation of the applicable research should be communicated to the

jury in the same manner that the court's evaluation of the applicable statutes and case law is communicated to the jury, that is, by instruction. The role of the jury is thus limited to applying the social framework given by the court to the specific facts of the case, just as the role of the jury is traditionally limited to applying the law given by the court to the specific facts of the case.
73 U.Va.L.Rev. at 592 (footnotes omitted).

**52**

### III

We now turn to the sentencing issues. Alger contends that the form of the sentence, including the enhancement, was illegal. Additionally, he asserts that an aggregate twenty-five year indeterminate term is excessive. We are not persuaded by either argument.

As noted earlier, the trial judge imposed a ten-year indeterminate sentence for the robbery, enhanced by a fifteen-year indeterminate period, pursuant to I.C. § 19-2520, for use of a firearm during the robbery. The judgment specified that the enhancement "will run consecutive" to the robbery term, "for a total term of twenty-five years." Alger now claims that by referring to "consecutive" sentences, the trial court has precluded the Commission of Pardons and Parole from considering him for parole until the robbery term of ten years has been fully served and the enhancement term has begun. This contention is without merit.

The Idaho appellate courts repeatedly have held that a sentence imposed under the firearm enhancement statute cannot be bifurcated from the underlying sentence imposed on the defendant. *E.g., State v. Money,* 109 Idaho 757, 710 P.2d 667 (Ct. App.1985). Of course, when a sentence is enhanced under I.C. § 19-2520, each segment should be separately identified in the judgment so the propriety of either component can be determined on appellate review. *State v. Storey,* 109 Idaho 993, 712 P.2d 694 (Ct.App.1985). But the aggregate sentence is deemed to be a single sentence for all other purposes. Here, although the term "consecutive" was used, the sentence should be administered as a unified twenty-five year indeterminate sentence. *See State v. Kaiser,* 108 Idaho 17, 696 P.2d 868 (1985). We will not presume the contrary.

We likewise conclude that the sentence is not excessive. In addition to the serious and violent nature of the robbery, the record discloses that Alger had five prior felony convictions and had served several terms of imprisonment. Upon reviewing the full record, and having considered the sentencing criteria set forth in *State v.*

*Toohill,* 103 Idaho 565, 650 P.2d 707 (Ct. App.1982), we conclude that the district judge did not abuse his discretion. Accordingly, the judgment of the district court is affirmed.

WALTERS, C.J., and SWANSTROM, J., concur.