206 P.3d 856

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Michael Jordan WRIGHT, Defendant–Appellant.**

No. 34017.

Court of Appeals of Idaho.

Feb. 6, 2009.

Review Denied May 12, 2009.

151

Molly J. Huskey, State Appellate Public Defender; Justin M. Curtis, Deputy Appellate Public Defender, Boise, for appellant. Justin M. Curtis argued.

Hon. Lawrence G. Wasden, Attorney General; John C. McKinney, Deputy Attorney General, Boise, for respondent. John C. McKinney argued.

LANSING, Chief Judge.

After a jury trial, Michael Jordan Wright was convicted of second degree murder. He appeals, asserting that the district court erred by excluding an expert's testimony on factors affecting the reliability of eyewitness identification and by refusing Wright's proffered jury instruction concerning these factors. Wright also asserts that his sentence-a unified life sentence, with a sixty-year minimum term—is excessive. We affirm.

# I.

## FACTS AND PROCEDURE

Preston James Gilmer was shot to death on the corner of Sixth and Grove Streets in downtown Boise in the early morning hours of May 22, 2005. Although other witnesses reported seeing Wright and the victim together on the evening in question, there was only one eyewitness to the shooting, and he identified Wright as the shooter. Before trial, defense counsel disclosed his intent to call an expert witness to testify concerning the pitfalls of eyewitness identification, and the State filed a motion to exclude this testimony. Following a hearing that included an offer of proof on the proposed testimony, the district court granted the State's motion. The district court expressed a number of concerns about the proposed testimony, but ultimately excluded it on the ground that the subject matter—the reliability of eyewitness identification and factors affecting that reliability—was not beyond the common knowledge of jurors and therefore the testimony of the expert would not be helpful to the jury.

At trial, the events that unfolded on the night of the shooting were described as follows. Kyle Russell, a white man, had been drinking and was standing on a street corner near a taco vendor's stand. Russell overheard three black men standing on the sidewalk about forty feet away, talking about marijuana. This drew Russell's attention, as he believed that a drug deal was in progress. According to Russell, two of the men walked a short distance away while Gilmer remained on the corner. Then one of the departing men turned around, walked back toward Gilmer, said "I've got your bud right here," pulled a gun, and shot Gilmer five times at close range. The shooter and the other black man then fled on foot.

Russell immediately called 911 on his cellular phone. During the conversation, which was recorded, Russell had the fleeing men in his sight and was reporting their movements. Police officers soon arrived, and Russell can be heard on the recording telling the officers that he could still see the men in an alley behind a music store, located about two blocks from the scene of the shooting. Russell told officers that the shooter had long hair, and was wearing a black hat and a black and red shirt or jacket. Russell said that the second man had short brown hair and wore blue jeans and a white t-shirt. One of the two men was captured by police behind the store, but the other escaped. At the scene, Russell informed officers that the captured man, Ernest James, was not the shooter but was the man who had been with the shooter. James was taken to the police station, where he was questioned. Photographs of James taken at the station were admitted at trial and show that he had short hair and wore blue jeans and a white t-shirt.

At trial, Russell testified that while at the police station on the night of the shooting, he was shown a photo array of six black men and that he positively identified Wright as the one who shot Gilmer. This testimony was contradicted, however, by the "lineup statement" form that Russell filled out after viewing the photo array. It did not indicate that he identified Wright, but instead said that he was "unable to make an identification from the photographs." In explanation, Russell testified that he had positively identified Wright, but that he told detectives that he wanted to see a profile view photo lineup to be sure because he had viewed the shooter from the side. Detective Mark Ayotte, who administered the photo lineup, contradicted Russell. Ayotte said that his notes did not indicate that Russell identified Wright, but that Russell said that two of the photos (neither of which were of Wright) "bore some resemblance" to the shooter. Ayotte confirmed that Russell asked to see profile views while expressing confidence that he could identify the shooter if he saw him again.

The police did not show Russell a profile-view photo array until December 7, 2005, almost seven months after the shooting and two days before Wright's preliminary hearing. Both Russell and Detective Greg Morgan, who administered this photo lineup, testified that Russell identified Wright in this photo array, and Russell filled out a lineup statement that confirms this. Wright was the only person whose photo appeared in both arrays. In addition, Wright's photo from the initial array had been printed in

local newspapers three times and had also been shown on television. Russell testified that he did not know this, because he had avoided all press coverage about the shooting on the instruction of the Boise police.

James initially told the police that he was not with Wright on the night in question, but later recanted and admitted that the two had been together. He testified that Wright's hair was then thirteen inches longer than James's. He said that he, his girlfriend, and Wright were initially at a bar, but that he and Wright left to buy cigarettes at a nearby convenience store. On the sidewalk they encountered Gilmer, who briefly walked with them. According to James, Gilmer stopped on the corner where the shooting occurred while James and Wright continued walking for a short distance, but Wright then turned around and walked back toward Gilmer. James, who was continuing to walk away, then heard shots, turned, and saw Gilmer on the ground and Wright running down an alley.

The trial included a number of witnesses who saw Wright, James and/or Gilmer in the minutes surrounding the shooting. James's girlfriend confirmed his testimony that she, Wright and James were together in a bar that night, that Wright and James left to get cigarettes, and that they never returned. Another witness who knew Gilmer, Wright and James testified that she was with Gilmer that night and she and Gilmer were entering a bar one-half block from the location of the shooting when Wright and James approached. They conversed with Gilmer briefly. Then Gilmer left with the two men. When she turned and did not see Gilmer behind her, she became worried and left the bar to look for him, saw a commotion, and ultimately found Gilmer dead on the street.

The taco vender testified that he looked up after hearing shots and saw two black men, whom he could not identify, leaving the scene and that these two men were the only persons in the area of the shooting. Another man standing in line at the taco stand heard shots and then saw two black men running

away from the scene, one with long hair and baggy pants, and the other with shorter hair and wearing a white t-shirt. A man who had been in a tattoo parlor across the street from the shooting testified that upon hearing shots he went to the door to look. A black man, wearing blue jeans and a white t-shirt, walked past him, within two feet, and, according to the witness, the man smelled of gunpowder. While the witness never saw a gun, he saw the man make suspicious movements, leading the witness to believe that he was attempting to hide a gun. This witness recalled seeing only one black man leaving the scene, and identified James, not Wright, as the man he had observed.

Two witnesses—James and a woman who was acquainted with Wright, James and Gilmer—testified to facts establishing a motive for Wright to kill Gilmer. Six months earlier, a good friend of Gilmer had shot and killed David Martin, Jr., a close friend of Wright, in a bar in downtown Boise. Wright took Martin's death particularly hard, even obtaining a "remembrance" tattoo honoring Martin. The female witness also testified to other bases of enmity between Wright and Gilmer.

David Martin's cousin testified that shortly after the shooting, Wright tapped on the window of the witness's house, which was located within walking distance of the shooting scene. Wright left with the witness's brother and never returned. The police looked for Wright in the Boise area for some time, but were unable to locate him.[1]

Trial evidence established that Gilmer was shot with a .25 caliber handgun. On the night of the shooting, the police thoroughly searched the shooting scene and the route the fleeing men had taken, but the murder weapon was not found. At trial, James denied having told a detective that Wright owned a .25 caliber pistol, but this testimony was impeached with testimony by a detective that James had in fact made this statement and had described the weapon.

1. Wright was eventually arrested in Arkansas nearly two months later, but this fact was not presented to the jury because the district court sustained a defense objection to evidence of Wright's location when apprehended.

At the close of trial, the defense requested a jury instruction on factors to be weighed in determining the reliability of an eyewitness identification. The district court refused the instruction, concluding that the subject matter was sufficiently covered by other instructions. The jury acquitted Wright of first degree murder, but found him guilty of second degree murder. The district court imposed a unified life sentence, with sixty years determinate. Wright appeals, challenging the exclusion of the expert witness testimony, the court's refusal of his proffered jury instruction, and the length of his sentence.

## II.

## ANALYSIS

### A. Exclusion of Defense Expert on Eyewitness Identification

■ Wright's proffered expert witness on the pitfalls of eyewitness identification was Dr. Roy Malpass, whose qualifications as an expert in this field have not been challenged. He testified at length at the hearing on the State's motion to exclude his testimony. Dr. Malpass described research findings about factors that can affect the accuracy of an eyewitness's perception and memory of events and thereby contribute to misidentification. In addition, Wright submitted a written offer of proof, to which were attached numerous reports and articles on pertinent social science research.

According to Dr. Malpass, the presence of a weapon in the vision of the witness has the effect of decreasing the accuracy of the witness's subsequent descriptions of and recognition of the offender. Studies indicate that this phenomenon, commonly known as "weapon focus," occurs because witnesses fixate their vision on the weapon. Dr. Malpass also spoke of the pitfalls of cross-racial identification. He described research findings showing that the rate of misidentification is 50 percent higher if the subject is not of the witness's own race. This phenomenon, Dr. Malpass noted, is not related to racial prejudice. Dr. Malpass's proffered testimony also explained how exposure to post-event information may alter a witness's memory. He said that exposure to photographs of a suspect in the press or media, for example, increases the likelihood that the same person will be chosen by the witness in a subsequent identification procedure. Dr. Malpass said that exposure to post-event information not only can change the witness's memory of the particular face, but also can change his or her memory of other details of the event, such as whether the witness was able to get a good look at the perpetrator.

Dr. Malpass also addressed how the actions of law enforcement investigators, including those who conduct lineups and photo arrays, can influence the witness's memory and level of confidence. He explained that exposure to multiple lineups in which only one person's face is repeated increases the likelihood that the witness will identify the repeated individual as the perpetrator. He said that people are generally unaware that their memory has been influenced in this fashion and will often deny that effect. Law enforcement can also accidentally or purposely influence a witness's confidence in an identification they have made, Dr. Malpass said, by giving the witness feedback. For example, if an officer tells the witness that the person selected from the lineup or photo array is the suspect, the witness is apt to become more confident and certain of the identification. This form of reinforcement can also change other aspects of witnesses' memory, including their recollection of how quickly or how confidently they made the identification before receiving the feedback.

Another research finding reported by Dr. Malpass—and one that seems particularly counter-intuitive—is that eyewitness confidence in an identification bears little or no correlation to its accuracy. That is, witnesses who express great confidence in their identification are not significantly more likely to be correct than witnesses who admit some doubt. And, as discussed above, the witness's level of confidence is easily inflated by post-identification feedback.

All of these components of Dr. Malpass's proposed testimony were directed at factors that could have had a bearing on Russell's identification of Wright as the shooter: eyewitness Russell saw the gun as the shooting occurred, made a cross-racial identification,

was exposed to two photo arrays in which only Wright's photograph was repeated, at the time of trial had an apparently incorrect recollection that he had identified Wright from the first photo array, and at trial expressed great confidence in his identification.

 The admission of expert witness testimony is governed by Idaho Rule of Evidence 702, which provides that testimony of qualified expert witnesses may be admitted if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue. . . ." Thus, expert testimony is admissible if it will inform the jury about a matter that is outside the common experience and knowledge of a lay juror and will assist the jury in deciding a material issue in the case. *State v. Hester,* 114 Idaho 688, 694, 760 P.2d 27, 33 (1988). Even if evidence is admissible under Rule 702, however, it may be subject to exclusion if its probative value is substantially outweighed by such factors as "the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." I.R.E. 403. Whether to allow expert witness testimony is committed to the trial court's discretion, and that court's ruling will not be overturned on appeal absent an abuse of discretion. *State v. Pearce,* 146 Idaho 241, 245, 192 P.3d 1065, 1069 (2008); *State v. Joslin,* 145 Idaho 75, 81, 175 P.3d 764, 770 (2007); *State v. Trevino,* 132 Idaho 888, 895, 980 P.2d 552, 559 (1999); *State v. Merwin,* 131 Idaho 642, 645, 962 P.2d 1026, 1029 (1998). When determining whether the district court abused its discretion, we consider: (1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the court acted within the boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the court reached

its decision by an exercise of reason. *Pearce,* 146 Idaho at 245, 192 P.3d at 1069.

To date, Idaho law concerning the admissibility of expert testimony on eyewitness identification has been ill-defined and has offered little to guide trial courts' exercise of their discretion when such evidence is offered. The earliest Idaho decision addressing the subject is *State v. Hoisington,* 104 Idaho 153, 657 P.2d 17 (1983). Our Supreme Court there noted that other jurisdictions had uniformly rejected this type of testimony, and it adopted the following holding of the Supreme Court of Rhode Island:

> We are persuaded that the subject matter of the proffered testimony in this case, the trustworthiness in general of eye witness observations, was not beyond the ken of the jurors, and therefore the trial justice did not abuse his discretion in excluding this evidence. Through cross examination, defense counsel was able to probe into the witness's capacity and opportunity for observation, her attention, interest and distraction. The jury was perfectly capable of assessing the witness's credibility by weighing the inconsistencies and deficiencies elicited in cross examination.

*Id.* at 165, 657 P.2d at 29 (quoting *State v. Porraro,* 121 R.I. 882, 404 A.2d 465, 471 (1979)). It must be noted, however, that the *Hoisington* opinion does not describe the content of the expert's proffered testimony, and it is consequently impossible to determine just what type of information the Supreme Court found to be within the ken of ordinary jurors.

Five years later, this Court questioned the continuing vitality of *Hoisington* in *State v. Alger,* 115 Idaho 42, 49–51, 764 P.2d 119, 126–27 (Ct.App.1988). We suggested that if the Supreme Court were again presented with the issue, the subsequently adopted Idaho Rules of Evidence, emerging social science research, and a developing trend toward admitting such evidence in other jurisdictions [2] would lead to a different result, at

---

2. Today, total exclusion of this sort of evidence is the minority view. The many decisions from other jurisdictions that, since *Hoisington,* have held expert evidence on the pitfalls of eyewitness identifications to be admissible, at least in some circumstances, include: *United States v. Mathis,* 264 F.3d 321, 334–42 (3rd Cir.2001); *United*

*States v. Villiard,* 186 F.3d 893, 895 (8th Cir. 1999); *United States v. Smith,* 156 F.3d 1046, 1052–53 (10th Cir.1998); *United States v. Harris,* 995 F.2d 532, 534 (4th Cir.1993); *Skamarocius v. State,* 731 P.2d 63 (Alaska Ct.App.1987); *State v. Chapple,* 135 Ariz. 281, 660 P.2d 1208 (1983); *People v. McDonald,* 37 Cal.3d 351, 208 Cal.Rptr.

least rejecting any categorical bar to expert testimony on eyewitness identification. We said:

> The current rules substantially undercut the justifications listed by the *Hoisington* court for precluding expert testimony on eyewitness identification. General research data pertaining to this topic is relevant under the rules. Where a scientist's research casts doubt upon the ability of eyewitnesses to perceive accurately—or to memorize and recall fully—certain observed events, such research clearly has a "tendency to make the existence of any fact of consequence to the determination of the action [i.e. the reliability of the eyewitness identification in the instant case] more probable or *less probable* than it would be without the evidence." I.R.E. 401 (emphasis added). Moreover, any concern for invasion of the jury's fact-finding mission is obviated by Rule 704, which permits experts to render opinions on ultimate issues. Accordingly, we conclude that expert testimony concerning eyewitness identification is admissible under appropriate circumstances. *See* I.R.E. 403.

*Id.* at 50, 764 P.2d at 127. To some extent, however, our comments in *Alger* may be regarded as dicta, for the issue presented was whether the trial court correctly excluded, as hearsay, a magazine article reporting social science research concerning the fallibility of eyewitness recall. This Court ultimately held that although the exclusion of the article was error, the error was harmless. *Id.* at 48–51, 764 P.2d at 125–27.

In *State v. Pacheco*, 134 Idaho 367, 371, 2 P.3d 752, 756 (Ct.App.2000), we reviewed a trial court's exclusion of a defense expert's testimony on the dependability of two witnesses' recollections of a firearm seen in the defendant's hands. After noting the *Hoisington/Alger* dichotomy, we found no error, noting that no offer of proof of the proposed testimony was provided and that both witnesses were police officers who were familiar with firearms. We said the reliability of these witnesses' observation of a firearm "was well within the ability of the jury to determine" such that "no expert testimony was needed to aid the trier of fact in understanding the evidence or determining a fact in issue." *Id.* In a footnote, however, we stated:

> We recognize that in appropriate circumstances such testimony, properly circumscribed, may be of assistance to the jury regarding eyewitness identification and the factors to be considered in determining the accuracy of such identification. *See, e.g., People v. Wright*, 45 Cal.3d 1126, 248 Cal. Rptr. 600, 755 P.2d 1049 (1988); CALJIC 2.92 (5th ed. 1996 Rev.).

*Pacheco*, 134 Idaho at 371 n. 2, 2 P.3d at 756 n. 2.

In *State v. Sanchez*, 142 Idaho 309, 320–22, 127 P.3d 212, 223–25 (Ct.App.2005), the defendant asserted that the district court violated due process and committed fundamental error by failing to sua sponte instruct the jury on the risks inherent in eyewitness identification. We said that it "would not have been error" to give such an instruction if one had been requested, but held that no fundamental error occurred because Sanchez was not deprived of a fair trial. In a footnote citing to the *Pacheco* footnote above, we stated that "[t]his Court has recognized that the use of expert testimony to assist the jury in assessing the accuracy of eyewitness identification can be appropriate." *Id.* at 322 n. 5, 127 P.3d at 225 n. 5.

The most recent reported decision touching on this subject is *Pearce*, 146 Idaho at 245–47, 192 P.3d at 1069–71, where the district court allowed a defense expert to testify concerning various characteristics of memory and techniques related to memory, but disallowed his testimony on photo array and in-person lineup procedures on the ground that the witness was not qualified as an expert in these areas. Thus, the issue on appeal was

236, 690 P.2d 709 (1984), *overruled on other grounds by People v. Mendoza*, 23 Cal.4th 896, 98 Cal.Rptr.2d 431, 4 P.3d 265, 278 (2000); *McMullen v. State*, 714 So.2d 368 (Fla.1998); *Cook v. State*, 734 N.E.2d 563, 569–71 (Ind.2000); *Commonwealth v. Christie*, 98 S.W.3d 485, 488–92 (Ky.2002); *State v. DuBray*, 317 Mont. 377, 77 P.3d 247, 254–55 (2003); *Echavarria v. State*, 108 Nev. 734, 839 P.2d 589, 597–98 (1992); *State v. Buell*, 22 Ohio St.3d 124, 489 N.E.2d 795, 800–04 (1986); *State v. Whaley*, 305 S.C. 138, 406 S.E.2d 369 (1991).

not the general admissibility of such testimony but whether the witness possessed the requisite qualifications. While noting that "it would likely have been helpful to have testimony from an expert" on the lineup procedures, our Supreme Court affirmed the district court's determination that the witness was not shown to be qualified to testify on that subject. *Id.* at 247, 192 P.3d at 1071.

In summary, the admissibility of expert testimony on eyewitness identification was directly at issue in only one Idaho case, *Hoisington,* and that opinion of our Supreme Court is of little guidance both because it predates the Rules of Evidence and much scientific research on the subject, and because it does not describe the content of the proposed expert testimony that was held to be within the ken of jurors. Save for the comment in *Pearce* above, our Supreme Court has not since spoken on the matter. Although this Court has thrice indicated, in *Alger, Pacheco,* and *Sanchez,* that expert witness testimony on eyewitness identification may be helpful to a jury in "appropriate circumstances," we have not been called upon to identify what those circumstances are. Today, we address that question.

Over forty years ago, the United States Supreme Court said that the "vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification." *United States v. Wade,* 388 U.S. 218, 228, 87 S.Ct. 1926, 1933, 18 L.Ed.2d 1149, 1158 (1967). In recent years, extensive studies have supported a conclusion that eyewitness misidentification is the single greatest source of wrongful convictions in the United States. *See State v. Dubose,* 285 Wis.2d 143, 699 N.W.2d 582, 591–92 (2005) (collecting studies). According to one article, over 2,000 studies have been done concerning eyewitness identification, far exceeding the research on most mental health evidence, and researchers are nearly unanimous on the reliability of these studies' findings regarding factors that contribute to eyewitness misidentification. *See* Richard S. Schmechel et al., *Beyond the Ken? Testing Jurors' Understanding of Eyewitness Reliability Evidence,* 46 JURIMETRICS J. 177, 178–80 (2006).

In our estimation, although some of these research findings may be generally concordant with what lay jurors would intuitively believe, the details of how specific variables affect memory accuracy, and the strengths of the correlations that the studies report, would nevertheless provide additional information about the reliability of eyewitnesses' recollection that is beyond a lay juror's common understanding. Moreover, some of the findings, such as the absence of correlation between a witness's confidence in an identification and its accuracy, and the fact that high-stress factors such as the presence of a weapon tend to diminish the witness's ability to perceive and recall, may be directly counter to a lay juror's expectations. Therefore, we disagree with the conclusion of the trial court here that all of the information that would have been conveyed through Dr. Malpass's testimony was within the ken of most jurors.[3]

This does not dictate, however, that scientific evidence on eyewitness identification must be allowed in all or most criminal trials where an eyewitness has testified. Of those trials that include some form of eyewitness identification, many do not turn primarily on the accuracy of the eyewitness's observation and memory because other substantial evidence corroborates the identity of the perpetrator or because the eyewitness was acquainted with the perpetrator. In these circumstances, it can reasonably be concluded that expert testimony would not materially "assist the trier of fact to understand the evidence or to determine a fact in issue." I.R.E. 702. In other instances, inconsistencies in or unreliability of an eyewitness identification can be adequately exposed through avenues other than expert testimony, such as cross-examination. Finally, any standard for use of such expert testimony should allow room for the trial court's exercise of discretion on the matter. In short, a standard that allows the balanc-

---

**3.** Some of Dr. Malpass's proffered testimony, however, was properly assessed to be within the ken of the average juror, including evidence that alcohol ingestion and lighting conditions can affect an eyewitness's ability to accurately perceive and remember.

ing of a variety of considerations is necessary.

We conclude that the appropriate standard was well articulated by the Supreme Court of California in *People v. McDonald*, 37 Cal.3d 351, 208 Cal.Rptr. 236, 690 P.2d 709, 727 (1984), where the Court said:

> When an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury, it will ordinarily be error to exclude that testimony.

*See also generally State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208, 1217–24 (1983). In other words, when the circumstances specified in *McDonald* are present, expert testimony so plainly "will assist the trier of fact to understand the evidence or to determine a fact in issue," I.R.E. 702, that refusal of the evidence would constitute an abuse of the court's discretion. Note that the *McDonald* formulation does not suggest that it would be error to *admit* the expert testimony in circumstances other than those described, but only that it would ordinarily be error to *exclude* it when those circumstances are extant. Thus, considerable discretion is vested in the trial court.

Applying this standard to the case before us, we conclude that the district court did not abuse its discretion by excluding Dr. Malpass's testimony. We acknowledge that eyewitness Russell's identification of Wright as the person who shot Preston Gilmer was an important component of the State's case, and that much of Dr. Malpass's proffered testimony would have identified specific factors that could have affected the accuracy of Russell's identification of Wright. The proffered testimony about the effect of weapon focus, cross-racial identification, the influence of exposure to post-event information, distortions that can arise from methods of presenting photo lineups, and the absence of correlation between the witness's confidence in an identi-fication and its accuracy all had a bearing here. Nevertheless, because there was other substantial, corroborative evidence of Wright's identity as the shooter, we hold that the exclusion of Dr. Malpass's testimony was not an abuse of discretion.

Numerous witnesses besides Russell contributed to the entire tableau that constituted the State's case against Wright. The taco truck vendor and other nearby witnesses confirmed that two black men hurried away from the shooting scene. The vendor said that these two men were the only persons in the area of the shooting. The testimony of both James and Gilmer's female friend placed Wright, James and Gilmer on the sidewalk together immediately before the shooting. Because the shooting was at point blank range, this evidence established that the shooter was either Wright or James, the only two men in the immediate vicinity of the victim.

James's testimony inherently pointed to Wright as the perpetrator. James's motive to finger Wright is obvious, but his denial of guilt is substantiated by the fact that although James was apprehended immediately after the shooting, he had no gun. The police searched the three block area between the site of the shooting and the site of James's apprehension. Of this three block area, two blocks were open ground. Despite a comprehensive search that included rooftops and alleyways, police did not find the murder weapon, leading to the conclusion that the handgun was likely in Wright's possession.

The State's evidence that Wright had a motive for the crime—to avenge Martin's murder—was also probative of his identity as the perpetrator and gave special relevance to the evidence that Wright fled to the home of a Martin family member immediately after Gilmer was shot.

Finally, the reliability of Russell's identification of Wright as the shooter is significantly bolstered by the circumstances of Russell's initial, immediate report to police. In the recording of the 911 call, which was played to the jury, Russell gave a moment-by-moment account of his observations of the two fleeing

men's actions. He gave physical descriptions, including hair length and clothing, and he said which of the them was the shooter. In a one-person show up minutes after James was captured, Russell cleared James, telling police that he was not the shooter. Thus, neither concerns about a time lapse between the witness's observation of the crime and the identification of a suspect nor the suggestiveness of police lineup procedures can cast doubt upon Russell's real-time reporting and on-the-scene "exoneration" of James. These circumstances not only markedly enhance the reliability of Russell's exoneration of James, they also diminish the prospect that Russell misidentified Wright from the police photo array or at trial, for several witnesses established that Wright was the only other person with James immediately before the shooting.

Because this was not a trial where an eyewitness identification was key to the State's case without other substantial corroborative evidence indicating the reliability of the identification, the district court did not abuse its discretion in disallowing the testimony of Dr. Malpass.

**B. Jury Instruction**

■ Although his proffered expert testimony was excluded, Wright requested a jury instruction listing factors that the jury should weigh in assessing the accuracy of an eyewitness identification. The district court declined the instruction, and Wright assigns error to this ruling.

■ Whether a jury has been properly instructed is a question of law over which we exercise free review. *State v. Gleason*, 123 Idaho 62, 65, 844 P.2d 691, 694 (1992). In charging the jury, a trial court must state all matters of law necessary for their information. I.C. § 19–2132(a). A defendant is entitled to an instruction on a defense theory if there is a reasonable view of the evidence that would support the theory. *Pearce*, 146 Idaho at 247, 192 P.3d at 1071; *State v. Eastman*, 122 Idaho 87, 90, 831 P.2d 555, 558 (1992); *Sanchez*, 142 Idaho at 320, 127 P.3d at 223. A trial court need not give a request-

ed instruction, however, even if it is a correct statement of the law, if the subject matter is sufficiently covered by other instructions given to the jury. *State v. Macias*, 142 Idaho 509, 511, 129 P.3d 1258, 1260 (Ct.App.2005); *State v. Ward*, 135 Idaho 400, 402, 17 P.3d 901, 903 (Ct.App.2001); *State v. Patterson*, 126 Idaho 227, 230, 880 P.2d 257, 260 (Ct. App.1994). When reviewing jury instructions, we ask whether the instructions as a whole, and not individually, fairly and accurately reflect applicable law. *State v. Bowman*, 124 Idaho 936, 942, 866 P.2d 193, 199 (Ct.App.1993).

The instruction that Wright requested was derived from California's CALJIC 2.92 instruction,[4] and stated:

Eyewitness testimony has been received in this trial for the purpose of identifying the defendant as the perpetrator of the crime charged. In determining the weight to be given eyewitness identification testimony, you should consider the believability of the eyewitness as well as other factors which bear upon the accuracy of the witness' identification of the defendant, including, but not limited to, any of the following:

The opportunity of the witness to observe the alleged criminal act and the perpetrator of the act;

The stress, if any, to which the witness was subjected at the time of the observation;

The witness' ability, following the observation, to provide a description of the perpetrator of the act;

The extent to which the defendant either fits or does not fit the description of the perpetrator previously given by the witness;

The cross-racial or ethnic nature of the identification;

The witness' capacity to make an identification;

Evidence relating to the witness' ability to identify other alleged perpetrators of the criminal act;

4. The current California jury instruction on eyewitness identification is CALCRIM 315, a modi-

fied version of CALJIC 2.92.

Whether the witness was able to identify the alleged perpetrator in a photographic or physical lineup;

The period of time between the alleged criminal act and the witness' identification;

Whether the witness had prior contacts with the alleged perpetrator;

The extent to which the witness is either certain or uncertain of the identification;

Whether the witness' identification is in fact the product of his own recollection;

Any other evidence relating to the witness' ability to make an identification.

In *Sanchez*, this Court said that if an instruction of this nature had been properly requested, it would not have been error for the trial court to give the instruction, *Sanchez*, 142 Idaho at 322 n. 5, 127 P.3d at 225 n. 5, but we have not held that such an instruction must be given, nor do we do so now. The requested instruction plainly is not on a point of law that is essential for the presentation of a theory of the defense. Although this instruction might help focus a jury's attention on matters to consider in evaluating the accuracy of an eyewitness identification, the mentioned factors can be fully discussed by counsel in closing argument. When no expert testimony has been admitted to elucidate upon these factors,[5] they are merely common considerations that counsel can highlight in argument without their mention in a jury instruction.

Here, an instruction was given that told the jury:

You are to consider all of the evidence admitted in this trial. However, the law does not require you to believe all of the evidence. As the sole judges of the facts you must determine what evidence you believe and what weight you attach to it.

This instruction adequately covered the subject matter of the defense's proposed instruction because it informed the jury that it need not accept, as accurate, the testimony of any witness, and Wright was free to emphasize at closing argument how the jury should apply any of the factors set forth in his proposed instruction when they evaluated Russell's testimony. Accordingly, we find no reversible error in the district court's refusal of the defense instruction.

## C. Sentence

■ Upon Wright's conviction for second-degree murder, the district court imposed a unified life sentence, with sixty years determinate. Wright asserts that this sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment to the federal constitution and Article I, Section 6 of the Idaho Constitution.

■ When reviewing an Eighth Amendment claim of cruel and unusual punishment, an appellate court must first make a threshold comparison of the crime committed and the sentence imposed to determine whether the sentence leads to an inference of gross disproportionality, *State v. Brown*, 121 Idaho 385, 394, 825 P.2d 482, 491 (1992), that is, we determine whether the sentence is out of proportion to the gravity of the offense committed. *Id.; State v. Robertson*, 130 Idaho 287, 289, 939 P.2d 863, 865 (Ct.App.1997). This *gross disproportionality test is equivalent to the standard under the Idaho Constitution, which focuses on whether the punishment is so out of proportion to the gravity of the offense as to shock the conscience of reasonable people. *Brown*, 121 Idaho at 394, 825 P.2d at 491. An "intra- and inter-jurisdictional" analysis is "appropriate only in the rare case" where the sentence is grossly disproportionate to the crime committed. *State v. Grazian*, 144 Idaho 510, 517, 164 P.3d 790, 797 (2007); *State v. Matteson*, 123 Idaho 622, 626, 851 P.2d 336, 340 (1993).

The offense here was very grave—an utterly unprovoked killing, apparently motivated by a desire for revenge against a friend of the victim. A unified life sentence with a sixty-year minimum term is not grossly disproportionate to the crime and does not shock the conscience of reasonable people.

---

**5.** *It is worth noting that without related expert testimony, use of this instruction presents hazards. For example, the third-to-last factor—"the extent to which the witness is either certain or uncertain of the identification" could be misap-* plied by the jury since many jurors likely would consider the certainty of an eyewitness to be an indicator of accuracy, when scientific research does not show such a correlation.

Therefore we hold that the sentence does not violate constitutional standards.

Wright also claims his sentence is excessively harsh and therefore constitutes an abuse of the district court's discretion. We will not conclude on review that a sentencing court abused its discretion unless the sentence is unreasonable under the facts of the case. *See Brown,* 121 Idaho at 393, 825 P.2d at 490; *State v. Sanchez,* 115 Idaho 776, 769 P.2d 1148 (Ct.App.1989); *State v. Toohill,* 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct. App.1982). The objectives of sentencing, against which the reasonableness of a sentence is to be measured, are the protection of society, the deterrence of crime, the rehabilitation of the offender and punishment or retribution. *Id.* In examining the reasonableness of a sentence, we conduct an independent review of the record, focusing on the nature of the offense and the character of the offender. *State v. Young,* 119 Idaho 510, 511, 808 P.2d 429, 430 (Ct.App.1991). The question before us is not whether the sentence is one that this Court would have chosen. Rather, if reasonable minds might differ as to the appropriateness of the sentence, the discretion vested in the district court will be respected.

Wright first argues that the district court took an incorrect view of the crime at sentencing by substituting its view for that of the jury. Specifically, he asserts that the district court improperly described the murder as "cold-blooded," even though Wright was acquitted of premeditated first degree murder. However, the district court did not expressly state that it viewed the murder as premeditated and we do not believe that use of the term "cold-blooded" inherently denotes that meaning. Therefore, this assertion of impropriety is without merit.

Wright also asserts that his lack of a significant prior felony record and his difficult childhood call for a lesser sentence. We disagree. Although Wright had only one felony conviction as an adult—for grand theft—he had a very extensive juvenile record that began when he was eleven years old and encompassed both property crimes and serious crimes of violence. Continuous rehabilitative efforts in the juvenile justice system proved ineffective, and an evaluation while Wright was still a juvenile indicated that he had an anti-social personality disorder with signs of sociopathic development. Wright executed a man on a city street by shooting him five times at point blank range. There was no provocation or threat coming from the victim. The district court determined that a senseless killing of this sort called for a harsh sentence, not only to punish Wright but in order to deter others from similar acts. Having independently reviewed the record, we cannot say that Wright's sentence is excessive under any reasonable view of the facts. *State v. Bowcut,* 140 Idaho 620, 97 P.3d 487 (Ct.App.2004).

## III.

## CONCLUSION

The district court did not commit reversible error by excluding a defense expert witness on eyewitness identification or by refusing a proffered jury instruction on factors to be weighed in assessing the accuracy of an eyewitness identification. The sentence was not excessive nor did it constitute cruel and unusual punishment. The judgment of conviction and sentence are therefore affirmed.

Judge PERRY and Judge GUTIERREZ concur.