997 P.2d 626

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Richard Allen DUNN, Defendant–Appellant.**

No. 24539.

Court of Appeals of Idaho.

Jan. 31, 2000.

Rehearing Denied Jan. 28, 2000.

---

Salladay & Harrigfeld, Boise, for appellant. Derek A. Pica argued.

Hon. Alan G. Lance, Attorney General; Kenneth K. Jorgensen, Deputy Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

Substitute Opinion; the Court's Prior Opinion Dated December 30, 1999, is hereby withdrawn

PERRY, Chief Judge.

Richard Allen Dunn appeals from the judgment of conviction and sentence entered after a jury verdict of guilty for first degree

murder. I.C. §§ 18–4001, –02, and –03.[1] For the reasons set forth below, we affirm.

# I.

## BACKGROUND

On the evening of November 20, 1995, Dunn, Travis McIntier, John Maynard, Shawn Norris, and others were in a park, drinking beer. Maynard hit McIntier in the head with a beer bottle, knocking him down. Dunn took McIntier's car keys out of his pocket and, along with Maynard and Norris, proceeded to beat McIntier. Eventually another individual brought McIntier's car to the location, and Dunn and Norris dragged McIntier to the car. They stuffed McIntier into the trunk.

Maynard drove the car, with Dunn, Norris, and two others as passengers, and McIntier in the trunk, to the Lucky Peak dam. Norris then drove the car from Lucky Peak to the area of the Mores Creek bridge. Upon arriving at that location, Norris opened the trunk, and Maynard and Dunn began to throw rocks at McIntier. Dunn, Norris and Maynard then lifted McIntier out of the trunk of the car, and Dunn and Maynard threw McIntier over the edge of a cliff, killing him.

Dunn, along with several other people, went to California in McIntier's car, where Dunn was eventually arrested. Dunn's uncle, an ex-homicide detective from Los Angeles, arranged for Dunn's surrender and drove Dunn to the police station where two Ada County detectives interviewed Dunn. At the beginning of the interview, Dunn was advised of his Miranda[2] rights. Dunn waived those rights and agreed to speak with the police. He made several incriminating statements. At some point during the interview, Dunn was permitted to speak with his uncle.

Thereafter, Dunn made additional incriminating statements. Dunn was charged with first degree murder and burglary.

Prior to trial, Dunn moved to suppress the statements he made to the police in California. The district court denied that motion. During trial, Dunn's co-defendant Norris testified on behalf of the state. Upon questioning, Norris testified that he had not made any plea bargain and that the state was seeking the death penalty against him. A jury found Dunn guilty of first degree murder both with deliberation and premeditation and in the perpetration of a robbery and/or kidnapping.

Dunn moved for a new trial based on, among other things, what he argued was false testimony elicited at his trial. The district court denied the motion. A sentencing hearing was held during which the state sought the death penalty. The district court sentenced Dunn to a term of fixed life.

Dunn appeals and claims that the district court erred when it denied his motion to suppress his statements. Dunn also contends that the district court erred when it denied his motion for a new trial. Finally, Dunn alleges that the district court considered factors not in the record in determining his sentence.[3]

# II.

## ANALYSIS

### A. Motion to Suppress

■ Dunn asserts that the waiver of his Miranda rights was not knowing, voluntary, and intelligent. First he argues that the district court erred when it determined that he was not mentally retarded. Dunn relies on his alleged mental retardation, lack of education, significant psychological problems, and drug addiction in support of his assertion

---

1. Dunn was also found guilty of unlawful entry. I.C. § 18-7034. However, he does not appeal from that judgment of conviction or sentence.

2. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. In his appellate brief, Dunn also challenged a jury instruction given by the district court. However, during appellate oral argument, Dunn

conceded this issue. Dunn also alleged that the district court violated his constitutional rights when it determined, before conducting an evidentiary hearing, that the death penalty was inappropriate in his co-defendant's cases. However, Dunn has failed to provide any authority in support of his argument and, thus, the issue is waived. State v. Zichko, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996).

that his *Miranda* waiver was ineffective. Finally, Dunn contends that his uncle, a former homicide detective in California who took Dunn to the police station, "subtly coerced" him into waiving his rights.

■ The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact which were supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct.App.1996). At a suppression hearing the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez–Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct.App.1999).

■ Any waiver of *Miranda* rights or the underlying constitutional privilege against self-incrimination must be made knowingly, voluntarily, and intelligently. *State v. Alger*, 115 Idaho 42, 45, 764 P.2d 119, 122 (Ct.App.1988). The state bears the burden of demonstrating that an individual has knowingly, voluntarily, and intelligently waived his rights by a preponderance of the evidence. *State v. Doe*, 131 Idaho 709, 712, 963 P.2d 392, 395 (Ct.App.1998). An appellate review of this waiver issue encompasses the totality of the circumstances. *State v. Johnson*, 126 Idaho 859, 863, 893 P.2d 806, 810 (Ct.App.1995); *Alger*, 115 Idaho at 46, 764 P.2d at 123.

■ The district court found that Dunn had twice waived his *Miranda* rights. The transcript from the interview indicates that Dunn was informed of, and verbally waived, his *Miranda* rights at the start of the interview. Additionally, a notification of rights form, signed by Dunn at the same time, indicates that he waived his *Miranda* rights. The notification of rights form, an express written statement wherein Dunn waived his *Miranda* rights, although not conclusive, is strong evidence of voluntary waiver. *See State v. Kirkwood*, 111 Idaho 623, 625, 726 P.2d 735, 737 (1986).

During the hearing on Dunn's motion to suppress, there was conflicting testimony regarding Dunn's mental capacity. Two psychologists testified on Dunn's behalf. Doctor Eisenbeiss examined Dunn on March 14, 1995, and testified that Dunn was a polysubstance abuser, had difficulty with his short-term memory, and was bipolar, severely manic-depressive without psychotic features. Doctor Eisenbeiss also testified that Dunn had attention deficit disorder. Doctor Dobson testified that, when Dunn was tested in October 1987 at age seventeen, his IQ was 64, a score in the "mentally deficient range." Doctor Dobson also testified, on cross-examination, that he could not say what Dunn's IQ was in November 1995.

Doctor Engle testified on behalf of the state. Doctor Engle based his testimony on medical records that he reviewed, all of which were admitted into evidence. Doctor Engle's review of a Department of Disabilities Services' evaluation of Dunn indicated that no evidence of mental retardation was present. Doctor Engle also reviewed Dunn's July 1988 medical file from St. Alphonsus Hospital, Dunn's 1987 file from the Boise School District, a 1987 evaluation from the Juvenile Diagnostic Unit, and Dunn's 1985 medical records from Hawthorne Community Hospital where Dunn's IQ was rated at 87. Based on his review of the aforementioned documents, Dr. Engle stated that, in his opinion, Dunn had the capacity to waive his *Miranda* rights.

At the close of the hearing on Dunn's suppression motion, the district court found that Dunn functioned at the low-average range of intelligence. It also found that in 1987, Dunn was afforded the opportunity to be in a special education program in high school. Moreover, the district court found that various assessments indicated that Dunn was bipolar, had an antisocial personality disorder, and had a substance abuse history. However, based on the testimony elicited at the hearing on Dunn's suppression motion and the documentary evidence submitted therein, the district court found that Dunn was not mentally retarded. The district court's factual finding is supported by sub-

170

stantial evidence and, thus, it will not be overturned on appeal.

■ Dunn also alleges that because of his drug addiction, the waiver of his *Miranda* rights was not knowing, voluntary, and intelligent. Doctor Engle testified that, based upon his review of the transcript from the police interrogation, Dunn was not under the influence of either alcohol or drugs at the time of the interview. One of the Ada County detectives who conducted the interview testified he did not detect any signs that Dunn was under the influence of alcohol or drugs during the interview. The district court also reviewed the transcript from Dunn's interview with the police. The district court found that Dunn appeared lucid and coherent. It also found that Dunn was very much a part of the conversation and dialogue, tracked along with the questions, and responded to those questions when he chose to. Moreover, the district court found that there was no evidence that Dunn was under the influence of either alcohol or drugs at the time of the interview. These findings are also supported by substantial evidence.

■ Finally, Dunn argues that his uncle "subtly coerced" him, making the waiver of his *Miranda* rights ineffective. Dunn asserts that his uncle, a retired police detective, arranged for Dunn's surrender and transported him to the police station. The record is devoid of any evidence regarding what, if anything, was said to Dunn on the way to the police station. Additionally, we note that, according to the transcript of Dunn's interview, Dunn waived his *Miranda* rights at the beginning of the interview. The notification of rights form was also signed at the beginning of the interview. According to the transcript, Dunn's uncle did not enter the interview room until well after Dunn had waived his *Miranda* rights and made incriminating statements. Thus, the record does not support Dunn's contention.

Moreover, the record indicates that Dunn was twenty-five years old at the time of the interview. He had been previously exposed to the criminal justice system on numerous occasions. Dunn had also been informed of his *Miranda* rights in the past and had waived those rights in writing at that time.

Based on our review of the record, this Court holds that, under the totality of the circumstances, Dunn's waiver of his *Miranda* rights was knowing, voluntary, and intelligent. Thus, the district court did not err when it denied Dunn's motion to suppress his statements.

## B. Motion for a New Trial

### 1. Norris's testimony

■ Dunn asserts that he is entitled to a new trial because false testimony was elicited during his trial. Dunn argues that Norris was afforded what "amounted to" an I.C.R. 11 plea agreement after he testified. Thus, according to Dunn, Norris's testimony regarding the absence of such an agreement was rendered false by this subsequent event, and a new trial is warranted.[4]

■ Pursuant I.C.R. 34, a motion for a new trial can be granted to a defendant if it is in the interests of justice. Whether the interests of justice are met in the circumstances of a particular case is a question directed to the sound discretion of the trial court. *State v. Scroggins*, 110 Idaho 380, 384, 716 P.2d 1152, 1156 (1985). In order for a district court to award a new trial based upon purportedly false testimony, the defendant must show: (1) the testimony given by a material witness was false; (2) without that testimony the jury might have reached a different conclusion; and (3) the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it, or, did not know it was false until after the trial. *Scroggins*, 110 Idaho at 384–85, 716 P.2d at 1156–57.

At the beginning of Norris's testimony, the prosecutor inquired as to the existence of a plea agreement between Norris and the

---

4. Dunn also argues that another witness was afforded the benefit of a plea bargain after testifying at Dunn's trial that there was no such agreement. However, information regarding that case is not contained within the record on appeal. Dunn also bases his argument on the assertion that Maynard pled guilty under the same circumstances. However, Maynard did not testify during Dunn's trial.

state. Norris testified that no such agreement existed. On cross-examination, Dunn's counsel inquired into the presence or absence of a plea agreement. Norris stated that, although he did not wish to be sentenced to death, he did not believe that his testimony would assist him in any way. Norris also testified that, approximately one year prior to trial, during an interview with the police, he had questioned the police regarding a plea bargain and was told that he would have to speak with his attorney. Finally, Norris testified that after consultation with his attorneys, the best he could do was to "hope" for a plea agreement.

After Dunn's trial, the district court, upon conferring with both the state and Norris concerning his case, indicated that it did not believe the death penalty was appropriate in Norris's case. The district court further indicated that, if it found that the death penalty was in fact appropriate, it would permit Norris to withdraw his guilty plea and proceed to trial. Thereafter, Norris decided to plead guilty. Dunn asserts that, based on these events, Norris's testimony, at Dunn's trial, regarding the absence of a plea agreement somehow *became* false.

The transcript from Norris's change of plea hearing reveals the following:

PROSECUTOR: One thing that might well be said, I think though. Counsel knows the State *is still seeking the death penalty.* There has not been any change in that. Just so there's no misunderstanding.

THE COURT: I understand. As I said before, *there have been no deals made by either side.* There have been no deals made by this Court.

(Emphasis added.). Thus, Dunn's assertion that Norris testified falsely at Dunn's trial because a plea agreement was, in fact, entered into thereafter is unsupported by the record. The district court's determination that, based on the record before it at the time, the death penalty would not be appropriate in Norris's case can not be construed as a plea agreement between Norris and the state. Moreover, if a plea agreement had been entered into after Norris's trial testimony, such an agreement would not make Nor-

ris's testimony, *at the time elicited,* false. Thus, Dunn has failed to satisfy the first prong of the *Scroggins* test. Therefore, the district court did not abuse its discretion in denying Dunn's motion for a new trial based on false testimony.

### 2. Prosecutorial misconduct

█ Dunn also contends that his due process rights were violated when, during opening statement and closing argument at his trial, the prosecution emphasized the absence of a plea agreement with Norris. Dunn contends that these references by the prosecution "served to inflame the jury toward Dunn" and, thus, violated his right to due process.

█ Dunn failed to object to the prosecution's remarks during the trial. Therefore, only if the remarks constitute fundamental error is Dunn entitled to relief. Prosecutorial misconduct during opening statement may constitute fundamental error only if the comments were so egregious or inflammatory that any consequent prejudice could not have been remedied by a timely objection and a ruling from the trial court informing the jury that the comments should be disregarded. *State v. Priest,* 128 Idaho 6, 13, 909 P.2d 624, 631 (Ct.App.1995). The same standard of fundamental error is applied for prosecutorial misconduct during closing argument. *See State v. Smith,* 117 Idaho 891, 898, 792 P.2d 916, 923 (1990); *State v. Peite,* 122 Idaho 809, 821–22, 839 P.2d 1223, 1235–36 (Ct.App.1992).

During its opening statement, the prosecution indicated that Norris would testify that he had "not been offered anything from the State for his testimony. No benefit whatsoever. That the State indeed, in writing, [had] told him that he [would] be tried for first degree murder...." Norris thereafter testified that no plea agreement existed. A letter from the state to Norris was admitted wherein Norris was informed that there would be no plea bargain in exchange for his testimony. During closing argument, the prosecution argued that Norris had testified "without a deal. There is no deal ..."

As determined above, Norris's testimony during Dunn's trial was not false, nor was it rendered false by subsequent events in Norris's case. Thus, Dunn's argument that the prosecution's comments, made during opening statement and closing argument, constituted misconduct are without merit as those remarks accurately reflected Norris's testimony. Therefore, Dunn's claim of prosecutorial misconduct fails.[5]

## C. Sentencing

 Finally, Dunn contends that the district court's finding, during sentencing, that Dunn was the group's leader was error. A judge may consider a broad range of information when fashioning an appropriate sentence. *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); *State v. Morgan*, 109 Idaho 1040, 1042, 712 P.2d 741, 743 (Ct.App.1985). A defendant is denied due process when the sentencing judge relies upon information that is materially untrue or when a judge makes materially false assumptions of fact. *State v. Gawron*, 124 Idaho 625, 627, 862 P.2d 317, 319 (Ct.App.1993).

In its sentencing memorandum, the district made the following finding in aggravation:

> 1. Of the six or more defendants associated with and prosecuted for crimes associated with the murder of then twenty year old Travis Jon McIntier, rudderless, dysfunctional group that they were, *the defendant was the closest thing to their leader.* The others in this otherwise aimless group viewed the defendant (who had failed to make his "rider" and had "topped out" a five year penitentiary sentence for Grand Theft,) with a bizarre combination of respect and fear. Even though the defendant when younger had been socially more of a "loner", and had never been a leader of others his own age, he was, at close to age 26 at the time of the murder, the *functional equivalent* of a leader with respect to the others who ranged approximately from age 18 to age 20.

(Emphasis added.). Dunn claims this finding is both material and false.

The record reveals that one motive for the murder was that Dunn wanted a car to enable him to drive to California. Additionally, Dunn claimed to be a gang member, and Maynard's desire to impress Dunn by achieving "OG" (original gangster status—achieved by killing someone) was also a motive for the murder. Moreover, Dunn was the oldest of the group and had served a five-year prison term. This evidence supports the district court's finding that Dunn was the "closest thing to a leader" of the group. Therefore, Dunn's constitutional rights were not violated when the district court found that he was the closest thing to a leader of the group of individuals involved in this crime.

## III.

## CONCLUSION

We hold that the district court's finding that Dunn was not mentally retarded is supported by substantial evidence. Additionally, based on the totality of the circumstances, Dunn's waiver of his *Miranda* rights was knowing, voluntary, and intelligent. Thus, the district court did not err when it denied Dunn's motion to suppress his statements. Norris's testimony regarding the presence or absence of a plea agreement was not false and, thus, the prosecution did not commit misconduct by commenting on Norris's testimony in opening statement or closing argument. Therefore, the district court did not err when it denied Dunn's motion for a new trial. The district court's finding that Dunn was the closest thing to a leader of the group of people involved in this crime is supported by substantial evidence. Accordingly, Dunn's judgment of conviction and sentence for first degree murder is affirmed.

Judge LANSING, and Judge Pro Tem M. CARLSON, concur.

---

**5.** Dunn also contends that these statements "nullified" jury instruction 33E. Upon review, we find no error in this regard.