**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 47546**

| | |
|---|---|
| STATE OF IDAHO, | ) |
| | ) **Filed: November 8, 2021** |
| Plaintiff-Respondent, | ) |
| | ) **Melanie Gagnepain, Clerk** |
| v. | ) |
| | ) **THIS IS AN UNPUBLISHED** |
| JUAN MANUEL MENCHACA | ) **OPINION AND SHALL NOT** |
| OLVERA, | ) **BE CITED AS AUTHORITY** |
| | ) |
| Defendant-Appellant. | ) |
| | ) |

Appeal from the District Court of the Third Judicial District, State of Idaho, Canyon County. Hon. George A. Southworth, District Judge.

Judgment of conviction for murder and for robbery, <u>affirmed</u>.

Eric D. Fredericksen, State Appellate Public Defender; Ben P. McGreevy, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Andrew V. Wake, Deputy Attorney General, Boise, for respondent.

_____

BRAILSFORD, Judge

Juan Manuel Menchaca Olvera appeals from his judgment of conviction for first degree murder, Idaho Code §§ 18-4001, 18-4003(a), and for robbery, I.C. § 18-6501. We affirm.

**I.**

**FACTUAL AND PROCEDURAL BACKGROUND**

On September 25, 2018, sixteen-year-old Olvera and several of his family members, including his mother, went to the residence of R.G. to confront R.G. about an incident that occurred the previous day when another man struck Olvera. While there, members of Olvera's family struck and kicked R.G., and Olvera took a handgun from R.G.'s residence. That same day at approximately 10:22 p.m., R.G. was shot multiple times and subsequently died at the hospital.

1

Olvera was identified as a suspect. Early the next morning, on September 26, officers located Olvera at the house of his friend, B.C., and arrested Olvera on an outstanding warrant unrelated to the murder of R.G. Following Olvera's arrest that day, the lead detective investigating R.G.'s murder, Detective Seibel, interviewed Olvera. During this September 26 interview, Detective Seibel read Olvera his *Miranda*[1] rights from a preprinted form, asked him if he understood his rights, and then asked him to sign the form indicating he understood his rights. Olvera did not sign the form.

Instead, Olvera stated he was "scared," had not been sleeping well, and was having nightmares. In response, Detective Seibel inquired about the last time Olvera slept and ate and whether he knew the date and advised him that, because he was a juvenile, he had the right to have a parent present during questioning. Detective Seibel then again inquired whether Olvera understood his rights to have a parent or an attorney present, and Olvera stated, "I don't know. What do you mean? So if I say I want my attorney, do I go back to juvi and then will we go to court?" Detective Seibel responded, "No, not necessarily," and then stated:

> Just advising you of what your rights are, your rights are you don't have to talk with me; your rights are you can have a parent present; and your rights are also you can have an attorney present while being questioned. Okay?

In response, Olvera stated "Okay."

Approximately thirty minutes into the interview, Olvera indicated he wanted to talk to his mother. When Detective Seibel stated she was aware of the confrontation at R.G.'s house involving Olvera's mother, Olvera stated he wanted to "get this straight, here, before we talk to my mom." The interview lasted approximately three hours, and Olvera was provided pizza and water. During this interview, Olvera maintained his innocence regarding R.G.'s murder, but Olvera did confess to taking the handgun and also money from R.G.'s residence.

Based on these admissions, the State filed a complaint on September 27, charging Olvera with robbery. On that same day, Detective Seibel attempted to interview Olvera a second time but stopped the interview when Olvera stated he wanted his mother to be present. More than a month later, on November 8, Detective Seibel interviewed Olvera about R.G.'s murder. Detective Seibel stated she knew Olvera had been appointed counsel for the robbery charge and read Olvera his *Miranda* rights, and Olvera indicated he understood his rights. During this third

---

[1]     *See Miranda v. Arizona*, 384 U.S. 436 (1966).

2

interview, however, Detective Seibel never advised Olvera that he had the right to have a parent present. This third interview lasted approximately one hour.

Then, on November 12, Detective Seibel interviewed Olvera a fourth time. At the beginning of this fourth interview, Detective Seibel read Olvera his *Miranda* rights; Olvera indicated he understood his rights; but again, Detective Seibel did not advise Olvera that he had the right to have a parent present for the interview. This fourth interview also lasted approximately one hour.

On December 5, the State filed a superseding indictment, charging Olvera with robbery and with R.G.'s murder. The following day, on December 6, Detective Seibel interviewed Olvera a fifth time. Again, Detective Seibel did not advise Olvera that he had the right to have a parent present. In response to Detective Seibel advising Olvera of his right to have an attorney present, Olvera agreed to speak without his attorney present. When Olvera indicated he would talk with Detective Seibel without his attorney present, Detective Seibel clarified, "Ok. Just so I understand--and you can stop talking to me at any time--you're willing to talk to me about the homicide and the robbery, without your attorney here?" Olvera responded affirmatively. Detective Seibel then stated, "And you know that you have the right not to talk to me, right?" Olvera answered, "Yeah." Although Olvera admitted to taking the handgun and money from R.G.'s residence during the first interview, Olvera never confessed to shooting R.G. during any of the interviews with Detective Seibel.

Olvera pled not guilty to both charges and filed a motion to suppress, arguing he did not validly waive his Fifth Amendment rights. The district court held a hearing on the motion at which Detective Seibel testified. Olvera also presented the testimony of Jeffrey Hall, a clinical psychologist. Dr. Hall testified that he completed a pediatric psychological report regarding R.G. The report, which stated that Dr. Hall and others preformed an evaluation of R.G.'s "neurodevelopmental status" in May 2018, was admitted into evidence. Also admitted into evidence were the recordings of all Detective Seibel's interviews with Olvera, except for the second interview, which Detective Seibel stopped when Olvera asked that his mother be present.

Following the suppression hearing, the parties submitted written closing arguments, and the district court issued a written decision denying Olvera's motion. Regarding Detective Seibel's first interview of Olvera on September 26, the court found that, after Detective Seibel read Olvera his *Miranda* rights, Olvera replied "yes," when Detective Seibel asked if Olvera

understood his rights. Additionally, the court found that Detective Seibel again advised Olvera that he did not have to talk to her, had the right to have a parent present, and had the right to have an attorney present before Detective Seibel inquired, "Okay?" to which Olvera responded, "Okay." Based on the totality of the circumstances, the court denied Olvera's suppression motion, concluding that he "understood his situation and his rights, and knowingly, intelligently, and voluntarily waived his right to remain silent."

Olvera moved for reconsideration of this denial, arguing he did not respond "yes" after Detective Seibel concluded reading Olvera his *Miranda* rights during the first interview on September 26. In support, Olvera admitted into evidence another copy of the audio recording of this first interview and presented the testimony of a witness who Olvera had retained to enhance the recording. That witness, however, testified that he was unable "to do anything to the audio to enhance its sound" and that he "didn't feel like [he] could enhance it or improve it any more than it already was."

Following the hearing on Olvera's motion for reconsideration, the district court issued a written decision denying the motion and ruling:

> [R]egardless of whether [Olvera] said "yes" at the interview time indicated, the analysis does not change under the totality of the circumstances. The audio unquestionably reveals [Olvera] responded, "Okay" when the detective repeated [Olvera's] rights and checked for understanding. [Olvera] knowingly, intelligently and voluntarily waived his rights when he orally indicated he understood his situation and his rights, and then proceeded to answer questions.

Olvera proceeded to a seven-day jury trial. During that trial, the State admitted the recordings of Detective Seibel's custodial interviews of Olvera and presented numerous witnesses, including Olvera's friend, B.C. B.C. testified that she saw Olvera at her house around 6 p.m. on the day of the murder; Olvera told B.C. that Olvera stole money from R.G.; but B.C. was not sure whether Olvera stole the money on the day of the murder. In response to this testimony, Olvera requested a conference outside the jury's presence; asserted B.C.'s testimony was about the "theft of money that occurred on a day other than the date of the charge in question" and was, thus, inadmissible under Idaho Rule of Evidence 404(b); and requested that the district court dismiss the case with prejudice. In response, the prosecutor noted the indictment specifically charged Olvera with taking money from R.G. The court denied Olvera's motion to dismiss the case, struck B.C.'s testimony about Olvera stealing money, and instructed the jury not to consider the statement.

4

The jury found Olvera guilty of both murder and robbery, and Olvera timely appeals his judgment of conviction.

## II.

## ANALYSIS

### A.      Suppression Motion

Olvera challenges the district court's denial of his suppression motion, arguing he did not waive his Fifth Amendment rights knowingly, voluntarily, and intelligently. The standard of review of a suppression motion is bifurcated. When a decision on a motion to suppress is challenged, we accept the trial court's findings of fact that are supported by substantial evidence, but we freely review the application of constitutional principles to the facts as found. *State v. Atkinson*, 128 Idaho 559, 561, 916 P.2d 1284, 1286 (Ct. App. 1996). At a suppression hearing, the power to assess the credibility of witnesses, resolve factual conflicts, weigh evidence, and draw factual inferences is vested in the trial court. *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995); *State v. Schevers*, 132 Idaho 786, 789, 979 P.2d 659, 662 (Ct. App. 1999).

*Miranda* warnings require a person to be informed of his Fifth Amendment privilege against self-incrimination before a custodial interrogation. Otherwise, any incriminating statements are inadmissible. *Miranda*, 384 U.S. at 492. An individual must waive his *Miranda* rights knowingly, voluntarily, and intelligently. *State v. Dunn*, 134 Idaho 165, 169, 997 P.2d 626, 630 (Ct. App. 2000). The State bears the burden of demonstrating a knowing, voluntary, and intelligent waiver by a preponderance of the evidence. *State v. Doe*, 131 Idaho 709, 712, 963 P.2d 392, 395 (Ct. App. 1998). A trial court's conclusion that a defendant made a knowing, voluntary, and intelligent waiver of his *Miranda* rights will not be disturbed on appeal where it is supported by substantial and competent evidence. *State v. Luke,* 134 Idaho 294, 297, 1 P.3d 795, 798 (2000).

When examining a juvenile's waiver of his *Miranda* rights, the courts evaluate the totality of the circumstances, including all the circumstances surrounding the interrogation. *State v. Samuel*, 165 Idaho 746, 764, 452 P.3d 768, 786 (2019). This inquiry includes evaluating the juvenile's age, experience, education, background, and intelligence and his capacity to understand the warnings given to him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights. *Id.* Additional factors include whether *Miranda* warnings

5

were given, the length of detention, the repeated and prolonged nature of the questioning, and the deprivation of food or sleep. *State v. Adamcik*, 152 Idaho 445, 468, 272 P.3d 417, 440 (2012).

On appeal, Olvera primarily challenges the district court's conclusion that he voluntarily, knowingly, and intelligently waived his Fifth Amendment rights during Detective Seibel's first interview on September 26. Olvera argues that "during the first interview, [he] did not indicate that he understood his *Miranda* rights." In support, Olvera identifies numerous facts, including that "he did not sign the form"; Detective Seibel did not explain that "anything [Olvera] said could be used against him" or that "he could get an attorney at no cost if he could not afford one"; his response of "Okay" to Detective Seibel's inquiry whether he understood his rights was not "an explicit affirmation that he understood"; he was "possibly under the influence of drugs"; Detective Seibel "subjected [Olvera] to prolonged questioning" lasting "about three hours"; Olvera had just "turned sixteen about one month before the first interview"; and "evidence indicates he is of below-average intelligence." In response, the State argues substantial and competent evidence supports the court's conclusion that Olvera voluntarily, knowingly, and intelligently waived his Fifth Amendment rights.

We hold that Olvera's waiver of his Fifth Amendment rights was voluntary, knowing, and intelligent. Although *Miranda* rights must be received and understood for a valid waiver, "*Miranda* does not require a written or express waiver." *State v. Butcher*, 137 Idaho 125, 132, 44 P.3d 1180, 1187 (Ct. App. 2002); *see also State v. Brennan*, 123 Idaho 553, 558, 850 P.2d 202, 207 (1993) (same). Accordingly, that Olvera did not sign the form indicating he understood his rights does not invalidate his waiver of those rights as Olvera suggests.

A review of the recording of the first interview demonstrates Detective Seibel read Olvera all of his *Miranda* rights, including stating that "anything you say may be used against you in the court of law" and that "if you cannot afford to hire a lawyer one will be appointed to represent you before questioning." The recording of the first interview demonstrates Olvera affirmatively acknowledged his understanding of his *Miranda* rights. Initially, Olvera talks over Detective Seibel when she inquires, "Do you understand each of these rights," by responding "yes" while Detective Seibel is stating "each of these rights." The response is, indeed, barely perceptible. Regardless, as the district court found, Olvera again affirmatively acknowledged his understanding of his *Miranda* rights after Detective Seibel read Olvera his rights, inquired about when he last slept and ate, and then repeated some of his rights. That Detective Seibel did not

6

reiterate all of Olvera's rights a second time does not invalidate Olvera's acknowledgment of his understanding of his *Miranda* rights.

The district court considered the other factors Olvera raises on appeal in support of his assertion that his waiver of his rights was not voluntary, knowing, and intelligent. Regarding the "possibility" that Olvera was "under the influence of drugs" during the first interview, Olvera did tell Detective Seibel that he had taken various drugs the previous day. The court, however, found "nothing indicated he was so intoxicated he lacked the capacity to understand where he was or what he was doing." Regarding Olvera's age and intelligence, the court found that Olvera can read and write, did not appear to be confused or not to know "what was going on," asked procedural questions, and "did not present so low and below average that he did not understand his rights." Further, the court found Olvera had previous experience with law enforcement.

Regarding the length of detention, the district court found that Olvera had eaten and slept that day; received food and water and was allowed to use the restroom during the interview; was not "repeatedly ask[ed] the same questions" but rather was asked "mostly" "to clarify and elaborate [on] his own voluntary statements." Based on these and other findings, the court concluded Olvera's will was not "overborn" by Detective Seibel. We conclude substantial and competent evidence supports the court's findings and decline to reweigh the evidence.

Finally, Olvera does not challenge the validity of his waiver of his Fifth Amendment rights in his subsequent interviews--with one exception. Olvera argues Detective Seibel's "inconsistent" position "regarding whether [Olvera] could have a parent present" "lowered the possibility [Olvera] understood his *Miranda* rights" and "increased the likelihood of confusion." Olvera contends his "access to a parent or other supportive adult is [a] factor to be considered" in determining whether he voluntarily, knowingly, and intelligently waived his Fifth Amendment rights.[2]

In support, Olvera cites *Gallegos v. Colorado*, 370 U.S. 49 (1962), and *State v. Doe*, 130 Idaho 811, 948 P.3d 166 (Ct. App. 1997). Those cases, however, address the juvenile's "access to a parent or supportive adult" in the context of determining whether a juvenile's confession was voluntary rather than coerced in violation of his due process rights. *See Doe*, 130 Idaho at 817, 948 P.2d at 172 ("[I]n evaluating the voluntariness of a juvenile's confession, consideration

---

[2]     Olvera acknowledges he does not have a constitutional right to a parent's presence during a custodial interrogation.

must be given to the child's . . . access to a parent or other supportive adult."); *see also Gallegos*, 370 U.S. at 55 (concluding juvenile's confession obtained in violation of due process where, among other things, interrogators failed to send for juvenile's parents). Whether a defendant waived his *Miranda* rights and whether he confessed voluntarily are different, albeit overlapping, analyses. *Samuel*, 165 Idaho at 762, 452 P.3d at 784. The Idaho Supreme Court has stated that "a juvenile's 'access to a parent or other support [sic] adult' is a factor evaluated when assessing the voluntariness of a juvenile's confession, not whether the juvenile has voluntarily waived *Miranda* rights." *Id*. at 765, 452 P.3d at 787; *see also State v. Doe*, 137 Idaho 519, 522-24, 50 P.3d 1014, 1017-19 (2002) (noting lack of parent's presence but ruling twelve-year-old juvenile validly waived *Miranda* rights).

In this case, Olvera only challenges the waiver of his *Miranda* rights; he does not challenge the voluntariness of any confession. Accordingly, Olvera's access to a parent during questioning is not a factor for consideration. *See Samuel*, 165 Idaho at 765, 452 P.3d at 787 (concluding access to parent not factor in evaluating waiver of *Miranda* rights). Regardless, the district court considered Olvera's access to a parent during questioning. The court found that Olvera voluntarily spoke without his mother present after he learned Detective Seibel was aware of Olvera's mother's involvement in the confrontation with R.G. on the day of the murder and that Detective Seibel did not offer to allow Olvera's mother to be present once the mother had become a suspect. We conclude that substantial and competent evidence supports these findings and that Detective Seibel's decision not to advise Olvera his mother could be present after the second interview did not undermine the validity of Olvera's waiver of his Fifth Amendment rights.

## B. Mistrial

Olvera argues the district court committed reversible error by not declaring a mistrial. In criminal cases, motions for mistrial are governed by Idaho Criminal Rule 29.1. A mistrial may be declared upon motion of the defendant, when there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, which is prejudicial to the defendant and deprives the defendant of a fair trial. I.C.R. 29.1(a). Our standard for reviewing a district court's denial of a motion for mistrial is well established:

> [T]he question on appeal is not whether the trial judge reasonably exercised his discretion in light of circumstances existing when the mistrial motion was made. Rather, the question must be whether the event which precipitated the motion for

mistrial represented reversible error when viewed in the context of the full record. Thus, where a motion for mistrial has been denied in a criminal case, the "abuse of discretion" standard is a misnomer. The standard, more accurately stated, is one of reversible error. Our focus is upon the continuing impact on the trial of the incident that triggered the mistrial motion. The trial judge's refusal to declare a mistrial will be disturbed only if that incident, viewed retrospectively, constituted reversible error.

*State v. Urquhart*, 105 Idaho 92, 95, 665 P.2d 1102, 1105 (Ct. App. 1983).

Olvera's assertion that the district court erred by not declaring a mistrial relates to B.C.'s testimony that, when Olvera was at B.C.'s house on the day of the murder, Olvera told B.C. he had stolen money from R.G. During B.C.'s direct examination at trial, the prosecutor inquired, "[w]hen [Olvera] arrived at your house, did he have anything on him that caught your attention?" to which B.C. responded, "No, just money." Further, B.C. testified:

Q. Did [Olvera] mention about stealing anything?
A. Yeah, the money.
Q. So tell me about what he said about the money.
A. He just said that [R.G.] was sleeping and he went in there and took the money.
Q. That day?
A. I'm not sure.
Q. So he didn't specify which day he had taken money from him?
A. No.

At this point, Olvera requested a conference outside the jury's presence. During that conference, Olvera asserted that "we've now brought in theft of money that occurred on a day other than the date of the charge in question" and that B.C.'s testimony was "clearly a violation of [Rule] 404(b)." Based on these assertions, Olvera requested that the district court "dismiss this case with prejudice." In response, the prosecutor noted the indictment specifically charged Olvera with taking money from R.G.

Ruling on Olvera's request to dismiss the case, the district court stated:

I'm not going to enter a dismissal at this time. I think the next argument coming from defense is to declare a mistrial. I'm not going to declare a mistrial. What I intend to do is instruct the jury that they are to disregard totally any statements about [Olvera] stealing that money and put it out of their minds.

When the jury returned, the court struck B.C.'s testimony about Olvera telling B.C. "he had stolen some money" and instructed the jury not to consider the statement "in any way whatsoever in your deliberations."

Olvera has not preserved the district court's decision not to declare a mistrial for review on appeal. Appellate courts have generally held that issues not raised below may not be considered for the first time on appeal. *State v. Fodge*, 121 Idaho 192, 195, 824 P.2d 123, 126 (1992). To be properly preserved for appeal, "both the issue and the party's position on that issue must be raised before the trial court to preserve the issue for appeal." *State v. Gonzalez*, 165 Idaho 95, 99, 439 P.3d 1267, 1271 (2019). In this case, although the district court ruled it would deny a motion for a mistrial, Olvera neither presented the issue to the court nor its position on the issue because Olvera never moved for a mistrial nor offered any argument in support of a mistrial. For this reason, Olvera failed to preserve this issue for appeal.

Regardless, the State does not argue that Olvera failed to preserve the issue. Instead, the State argues B.C.'s testimony that Olvera stole money from R.G. was not inadmissible under Rule 404(b). Rule 404(b) prohibits the introduction of evidence of acts--other than the crime for which a defendant is charged--if the evidence's probative value is entirely dependent upon its tendency to demonstrate the defendant's propensity to engage in such behavior. *State v. Grist*, 147 Idaho 49, 54, 205 P.3d 1185, 1190 (2009). Rule 404(b) does not extend to evidence of acts which are intrinsic to the charged offense. *State v. Pullin*, 152 Idaho 82, 87, 266 P.3d 1187, 1192 (Ct. App. 2011).

The district court did not expressly rule that B.C.'s testimony about Olvera taking money from R.G. was inadmissible under Rule 404(b), but its decision to strike the testimony and to instruct the jury to disregard it was at least an implicit ruling the evidence was inadmissible. *Cf. State v. Miller*, 157 Idaho 838, 842, 340 P.3d 1154, 1158 (Ct. App. 2014) (ruling court implicitly overruled objection by allowing testimony to proceed). The evidence, however, was relevant to the charged conduct that Olvera took money from R.G. *See* I.R.E. 401(a) ("Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence."). Specifically, the State charged Olvera with taking money from R.G. "on or about" September 25. B.C.'s testimony that Olvera told her on September 25 that he had taken money from R.G. is relevant to the charged crime even if Olvera did not specifically tell B.C. he had taken the money that day. Evidence is not presumptively inadmissible under Rule 404(b) because there is a mere possibility it could relate to a crime other than that charged. *See Pullin*, 152 Idaho at 87, 266 P.3d at 1192 ("Whether the evidence found in the vehicle was attributable

10

to Pullin was a conclusion that was left to the jury. Therefore, the evidence from the vehicle did not fall within the scope of Rule 404(b) or its notice requirement.").

Moreover, even if the evidence were inadmissible under Rule 404(b), the district court's instruction to the jury cured any error. After striking the challenged testimony, the court instructed the jury:

> Ladies and gentlemen of the jury, during the last portion of [B.C.'s] testimony, you heard a statement about that [Olvera] told her that he had stolen some money. I am striking that statement from the record. You are instructed you're not to give it any credence nor consider it in any way whatsoever in your deliberations.

We presume the jury followed the court's instructions and did not consider B.C.'s testimony regarding Olvera's admission that he stole money from R.G. *See State v. Kilby*, 130 Idaho 747, 751, 947 P.2d 420, 424 (Ct. App. 1997) (presuming jury followed court's instruction); *State v. Hudson*, 129 Idaho 478, 481, 927 P.2d 451, 454 (Ct. App. 1996) (same). Further, we reject Olvera's assertion that B.C.'s testimony is so "high[ly] prejudicial" and the State's evidence is so weak as to rebut the presumption the jury followed the court's instruction.

## III.

## CONCLUSION

The district court did not err when denying Olvera's suppression motion. Further, Olvera did not preserve for appeal whether the court erred by denying a motion for a mistrial because Olvera never made such a motion. Accordingly, we affirm the judgment of conviction for murder and for robbery.

Judge GRATTON and Judge LORELLO **CONCUR**.